UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

SHEILA MARTIN,                )
                              )
        Plaintiff,            )          Civil No. 13-88-GFVT
                              )
V.                            )
                              )       **MEMORANDUM OPINION**
CAVALRY SPV I, LLC,           )              **&**
                              )           **ORDER**
        Defendant.            )
                              )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Motion to Compel Arbitration filed by

Defendant Cavalry SPV I, LLC ("Cavalry"), in which Cavalry requests the Court to

compel arbitration and to stay further proceedings in this case pending arbitration,

pursuant to the Federal Arbitration Act, 9 U.S.C. §1 *et seq*. [R. 16.] For the reasons

explained below, Cavalry's motion will be GRANTED.

**I**

This case arises out of a class action lawsuit filed by Plaintiff Sheila Martin

concerning the collection of her credit card debt. At some point in the past, Martin

opened a Lowes credit card, which was originally issued by GE Capital Retail Bank

("GE") and was governed by a Credit Card Agreement. [R. 1 at ¶ 10; R. 16-1 at 1-2.]

According to Martin, GE "charged off" her credit card account on August 11, 2009, when

the charge-off amount Martin owed on her debt was $806.50. [R. 20 at 11.] After that

point, GE no longer imposed or accrued interest on Martin's credit card account. [*Id*.]

The Credit Card Agreement expressly states that GE has the right to "sell, assign or transfer any of [its] rights or obligations under [the] Agreement." [R. 16-1 at 2; R. 16-2 (Ex. 1) at 8 (Rivera Decl. Ex. C).] Pursuant to that clause, Defendant Cavalry SPV I, LLC ("Cavalry") purchased Martin's credit card account from GE on September 23, 2010. [R. 16-1 at 2.] In January, 2013, Cavalry attempted to collect on Martin's debt. According to Martin, she and Cavalry reached an agreement in which Martin would pay Cavalry $75.00 per month until her debt was satisfied, but on April 4, 2013, Cavalry filed a motion for default judgment against Martin in Whitley County District Court for failure to pay her debt. [R. 1 at ¶¶ 11-14.] Martin then filed suit against Cavalry in this Court on April 30, 2013, alleging that Cavalry had violated the Fair Debt Collections Practices Act, 15, U.S.C. § 1692, *et seq.* ("FDCPA"), as well as Kentucky's interest and usury statute, KRS 630.010, *et seq.* [*See* R. 1.] Specifically, Martin alleges that Cavalry violated the FDCPA by illegally attempting to collect a debt, accruing and imposing interest retroactively, and charging interest at a rate of 21.99% which exceeds the interest rate allowed by Kentucky law. [R. 1 at ¶¶ 19-23.]

In support of the instant motion, Cavalry contends that its purchase of Martin's account from GE also included a transfer of GE's contractual rights under the Credit Card Agreement. The Credit Card Agreement contains an arbitration provision which expressly states that "any past, present, or future legal dispute or claim of any kind" must be resolved by binding arbitration if any party to the agreement elects to arbitrate. [R. 16-1 at 2; R. 16-2 (Ex. 1) at 8 (Rivera Decl. Ex. C).] Because of that provision, Cavalry argues that pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §1 *et seq.*, and under the terms of the Credit Card Agreement, the Court is required to compel arbitration

in this case, and that § 3 of the FAA also requires the Court to stay further proceedings pending the outcome of arbitration. [R. 16-1 at 4-10.]

In response, Martin contends that Cavalry cannot invoke the arbitration provision because Cavalry only purchased an account receivable and did not purchase GE's other contractual rights contained in the Credit Card Agreement. Specifically, Martin argues that arbitration should not be compelled because 1) the scope of GE's assignment of her account to Cavalry did not include a transfer of GE's corresponding contractual rights, and therefore GE cannot invoke the arbitration provision against her [R. 20 at 2-10]; and 2) that even if the assignment included the arbitration provision, Cavalry's alleged violations of the FDCPA and Kentucky's usury laws are outside the scope of the agreement to arbitrate. [*Id*. at 11-15.]

## II

### A

Cavalry bases its argument on the Federal Arbitration Act ("FAA"), 9 U.S.C. §1 *et seq*., which "manifests a liberal federal policy favoring arbitration agreements." *Masco Corp. v. Zurich American Ins. Co*., 382 F.3d 624, 626 (6th Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (internal quotation marks omitted). Section 2 of the FAA states that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Javitch v. First Union Sec., Inc*., 315 F.3d 619, 624 (6th Cir. 2003) (applying §2 in the context of the Sixth Circuit's interpretation of arbitration clauses). According to the United States Supreme Court, the FAA "places arbitration agreements on an equal

footing with other contracts, and requires courts to enforce them according to their terms." *Rent –A-Center, Est, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010) (internal citations omitted).

When a party is "'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration,'" that party "may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for'" by the contract. *Rent-A-Center*, 130 S.Ct. at 2776 (quoting 9 U.S.C. § 4). The court then "shall order arbitration upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Id.* (quoting 9 U.S.C. § 4). The FAA further provides that once the court determines that the dispute "is referable to arbitration" under an agreement to arbitrate, the court must stay all further proceedings in the case "until the arbitration process is complete." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing 9 U.S.C. §3).

When a "contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be in favor of coverage." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986) (internal citations and quotation marks omitted). "Courts are to examine the language of the contract in light of the strong federal policy in favor of arbitration," and "any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). This presumption of arbitrability is "particularly applicable" where the arbitration clause

at issue is broad, such as clauses that submit to arbitration "any and all disputes," or "any differences arising with respect to the interpretation of this contract. . . ." *AT&T Techs.*, 475 U.S. at 650; *see also United Steelworkers of Am. v. Mead Corp., Fine Paper Div.*, 21 F.3d 128, 131-32 (6th Cir. 1994). Despite the presumption in favor of arbitration, however, a party cannot be compelled to arbitrate "any dispute that the party has not agreed to so submit." *Bratt Enterprises, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 612 (6th Cir. 2003). "While ambiguities. . . should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract. . . ." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal citations omitted).

Before compelling an unwilling party to settle a dispute by arbitration, the Court must apply a two-part test "to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch,* 315 F.3d at 624. Although the FAA "preempts state laws and policies regarding arbitration," in determining whether a "valid agreement" to arbitrate exists between the parties, the Court should apply state contract law, "provided the contract law applied is general and not specific to arbitration clauses." *Fazio*, 340 F.3d at 392-933 (citing *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996)). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-2. The Sixth Circuit has recognized, however, that even when applying state-law principles of contract

interpretation, "'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.'" *Bratt Enterprises, Inc.*, 338 F.3d at 613 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 475–76 (1989)).

Finally, "the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.—Ala.v. Randolph*, 531 U.S. 79, 91-92 (2000); *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).

**B**

The arbitration clause at issue here provides for the arbitration of a broad category of disputes. Specifically, the arbitration section of the Credit Card Agreement reads as follows in bold print:

> **ARBITRATION PROVISION**. Please read this arbitration provision carefully. **IT PROVIDES THAT ANY PAST, PRESENT, OR FUTURE LEGAL DISPUTE OR CLAIM OF ANY KIND, INCLUDING STATUTORY AND COMMON LAW CLAIMS AND CLAIMS FOR EQUITABLE RELIEF, THAT RELATES IN ANY WAY TO YOUR ACCOUNT OR YOUR RELATIONSHIP WITH US ("CLAIM") WILL BE RESOLVED BY BINDING ARBITRATION IF EITHER YOU, WE OR LOWE'S ELECTS TO ARBITRATE.**

[R. 16-2 (Ex. C) at 8.] This provision then defines "We," "Us," and "Our" as meaning "(1) GE Money Bank and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors. . . and (2) Lowe's Companies, Inc. . . ." [*Id*.] The provision further describes the agreed-upon procedure for electing to arbitrate, providing notice, choosing an administrator, and states that the agreement is governed by the FAA. [*Id*.] The agreement also specifies that Martin had a right to reject the Arbitration provision, and that she could do so without affecting the

other terms of the contract by sending notice within sixty days after opening the account. [*Id*.]  Martin does not dispute that she failed to reject the arbitration provision.

A further limitation in the arbitration clause states that "if a claim goes to arbitration, neither you nor we will have the right to: (1) have a court of a jury decide the claim; (2) engage in discovery. . . ; (3) participate in a class action in court or in arbitration, either as a class representative or a class member; . . . or (5) join or consolidate your claims(s) with claims of any other person. . . ."  [*Id*.]  Additionally, the agreement clearly allows GE to "sell, assign or transfer any of [its] rights or obligations under this Agreement or your Account, including our rights to payments, without prior notice to you."  [*Id*.]

### III

#### A

"Both federal and Kentucky law favor the enforcement of arbitration agreements."  *Whalen v. Lord and Moses, LLC*, 2009 WL 3766327 at *1 (E.D. Ky. Nov. 10, 2009) (citing other sources).  However, as explained above, when evaluating a motion to compel arbitration, the first step is to determine whether a "valid agreement to arbitrate exists between the parties."  *Masco Corp.*, 382 F.3d at 624.  Martin contends that no agreement to arbitrate exists between her and Cavalry because Cavalry was not an original party to the Credit Card Agreement, and because Cavalry bought only the right to receive payment and not the right to invoke arbitration.  However, the agreement to arbitrate this dispute plainly applies to Cavalry as an assignee of GE Money Bank.

The FAA requires courts to place arbitration provisions "upon the same footing as other contracts."  *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 629-30 (2009) (internal

quotations omitted).  Thus, Kentucky contract law will govern in determining "whether the arbitration clause itself was validly obtained."  *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt*., 2013 WL 28067, at *2 (E.D. Ky. Jan. 2, 2013) (quoting *Casarotto*, 517 U.S. at 686-87).  State law only applies, however, to the extent of determining "which contracts are binding under § 2 and enforceable under § 3 *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."  *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416-17 (6th Cir. 2011) (quoting *Arthur Andersen LLP,* 556 U.S. at 630-31).  Moreover, even when applying state law concerning contract formation, the Court still must "examine the language of the contract in light of the strong federal policy favoring arbitration," and any resolve ambiguities in favor of arbitration."  *Stout*, 228 F.3d at 714.

**1**

First, principles of basic contract law support the finding that GE transferred its right to invoke arbitration to Cavalry along with the right to collect on Martin's debt. Kentucky contract law mandates that an unambiguous written instrument "be enforced strictly according to its terms."  *Frear v. P.T.A. Industries, Inc*., 103 S.W.3d 99, 106 (Ky. 2003) (quoting *O'Bryan v. Massey-Ferguson, Inc*., 413 S.W.2d 891, 893 (Ky. 1966)).  If any ambiguity exists, the Court must determine if possible "the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written. . . ."  *Id.*  Where there is no ambiguity, however, courts should "interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence."  *Id*.

Here, Martin does not argue that any ambiguity exists in the Credit Card Agreement or in the Bill of Sale between GE and Cavalry. The Court therefore must give the terms of these agreements their plain meaning. The Credit Card Agreement clearly stated that the parties to the agreement included all of GE's "successors" and "assigns." The Agreement also clearly stated that GE had a right to "sell, assign or transfer any of our rights or obligations under this Agreement or your account." [R. 16-2 (Ex. C to Rivera Decl.) at 8.] The arbitration agreement also explained exactly what was meant by binding arbitration and specified that the provision could be invoked by either party. Giving the language its ordinary meaning, Martin's consent to be bound by the Credit Card Agreement also bound her to arbitrate any disputes with any party to whom GE assigned or transferred its rights or Martin's account. *See Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 355, 341 (Ky. Ct. App. 2001) (citations omitted). The Bill of Sale between GE and Cavalry states that by executing that agreement, GE Money Bank "hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, all right, title and interest in and to the Receivables. . . delivered by Seller to Buyer on each Transfer Date. . . ." [R. 16-2 (Ex. A to Rivera Decl.) at 3.] In the absence of allegations or evidence concerning ambiguity, the plain meaning of the words indicates that GE transferred "all right" to Martin's account "as set forth in the Agreement." [*Id.*]

It is "'the settled rule in Kentucky that one who signs a contract is presumed to know its contents, and that if[she] has an opportunity to read the contract which [she] signs [she] is bound by its provisions, unless [she] is misled as to the nature of the writing which [she] signs, or [her] signature has been obtained by fraud.'" *Whalen*, 2009 WL

3766327, at *1 (quoting *Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012, 1015 (6th Cir. 1952)). Martin does not allege that she misunderstood or was misled as to the contents of the Credit Card Agreement, nor does she allege that she did not have an opportunity to read its provisions, or that her agreement was obtained by fraud. Absent evidence to the contrary, the Court finds that Martin presumably was aware of and understood the contents of the agreement, including the provisions concerning arbitration and assignment. Basic contract law also would allow the Court to invalidate the arbitration provision "for the same reasons for which any contract may be invalidated, including forgery, unconscionability, and lack of consideration." *Fazio*, 340 F.3d at 393-94. Martin, however, does not allege that either the arbitration provision or the Credit Card Agreement was unconscionable, or otherwise subject to additional contract defenses.

## 2

Second, when considering the matter in the specific context of law concerning contractual assignments and sales of accounts receivable, it is clear that the right to invoke arbitration was transferred to Cavalry along with the right to receive payment from Martin. Kentucky law recognizes that an assignee to a contract stands in the shoes of the assignor in the sense that the rights and obligations of the assignor are transferred to the assignee along with the contract. *See Holzbog v. Bakrow*, 160 S.W. 792, 793 (1913); *Kentucky Mut. Inv. Co.'s Assignee v. Schaefer*, 85 S.W. 1098, 1098-99 (1905). Moreover, Kentucky has adopted Section 9-318 of the UCC concerning this particular issue. Under KRS §355.9-404, which is Kentucky's version of UCC §9-318(1)(a), the rights acquired by an assignee to accounts receivable are subject to the following:

(a) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

(b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment. . . .

KRS §355.9-404(1). The arbitration provision in the Credit Card Agreement was clearly a term of the agreement that could be invoked by either Martin or by GE, and now can be invoked by either Martin or by Cavalry. Martin can still assert other defenses or claims arising from the Credit Card Agreement against Cavalry, and Cavalry's relationship with Martin is similarly subject to the defenses or claims that GE would have had against Martin.

Other courts faced with disputes concerning the rights of assignees to accounts receivable have also applied this statute in similar circumstances. For example, in *First Nat'l Bank of Louisville v. Master Auto Servs. Corp.*, the First National Bank of Louisville was the assignee of a company's accounts receivable and attempted to collect the debt initially owed to the assignor, and the court applied Section 9-318(1)(a) of the UCC, as adopted by Kentucky statute, to determine that "the rights of an assignee are subject to 'all the terms of the contract between the account debtor and any defense or claim arising therefrom . . . .'" 693 F.2d 308, 312 (4th Cir. 1982) (quoting KRS §355.9-318[1]). Based on Kentucky's adoption of the UCC, the court found that the rights of the assignee of accounts receivable are the same as the rights of the original party to the contract from which the claim arises, and thus the rights of the assignee against the debtor are subject to all the terms of the agreement between the original parties. *Id*. at 312-13. Although the assignee of accounts receivable "has no better rights than those of [the

---

[1]    This provision is currently found at Ky. Rev. Stat. § 355.9-404, as quoted above.

assignor]," the assignor's original rights are transferred with the right to collect payment.

*Id*. at 314. The Sixth Circuit has similarly applied the same provision of the UCC when

explaining that the rights of an assignee to accounts receivable are subject to all of the

provisions of the assignor's original contract with the account debtor. *Nat'l City Bank,*

*Northwest v. Columbian Mut. Life Ins. Co.*, 282 F.3d 407, 410 (6th Cir. 2002).

Other courts have also determined that a transfer of accounts receivable includes

the transfer of the underlying contractual terms, including arbitration provisions such as

the one at issue here. *See, e.g., Systran Financial Servs. Corp. v. Giant Cement Holding,*

*Inc.*, 252 F. Supp. 2d 500, 503-05 (N.D.Ohio 2003) (finding that because a sale or

transfer of accounts receivable is governed by Article 9 of the UCC, the assignee "stands

in the shoes of" the assignor and takes the assignment subject to all defenses and claims

in the original agreement, including the application of an arbitration clause); *GMAC*

*Commercial Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209, 214 (S.D.N.Y.

2001) (holding that a state's adoption of Article 9 of the UCC meant that a contract's

arbitration clause applies to a finance assignee the same as it would apply to the

assignor); *Cone Constructors Inc. v. Drummond Community Bank*, 754 So.2d 779, 780-

81 (Fla. Dist. Ct. App. 2000) (explaining that the UCC explicitly provides that an

assignee of accounts receivable is subject to all terms of the contract between the account

debtor and the assignor and to any defense or claim arising from the contract, including

arbitration provisions); *Banque De Paris et des Pays-Bas v. Amoco Oil*, 573 F.Supp.

1464, 1470 (S.D.N.Y. 1983) (finding that in states where the UCC has been adopted, an

assignee of accounts receivable "is entitled to enforce an arbitration clause as one of the

rights acquired by assignment"); *Oxford Commer. Funding, LLC v. Cargill, Inc.*, 2002

WL 31455989, at *3 (N.D. Illinois 2002) (finding that "in cases addressing the assignment of accounts receivables, courts have held that the assignee 'stands in the shoes of the assignor'" and therefore even when a party is "only assigned the right to payments" any provisions that were "a term of the Contract out of which [the assignee's] accounts receivables were created" are enforceable) (quoting other sources).

Martin argues that the transfer of the right to collect payment on her debt did not also transfer other rights related to the underlying contract. Neither party has presented controlling case law on the specific issue of assignment of arbitration provisions,[2] but the UCC provides that an assignment or other transfer "of 'the contract' or of 'all my rights'" as related to the contract "or an assignment in similar general terms" transfers both the underlying contractual rights, and also the corresponding duties unless otherwise indicated. UCC §2-210; *Pays-Bas*, 573 F. Supp. at 1469-70; *see also GMAC Commercial Credit LLC*, 171 F. Supp. 2d at 214 ("General assignments [of a contract] confer both the assignor's rights and obligations to the assignee."). While differences may exist between general contractual assignments and finance assignments, assessment of the relevant caselaw on this issue reveals that although parties often dispute whether a finance assignment confers the assignor's *obligations* as well as rights, it is settled law that contractual *rights* at least are transferred to an assignee of accounts receivable. *See GMAC Commercial Credit LLC*, 171 F. Supp. 2d at 214.

---

[2]    The only cases Martin cites are either distinguishable or irrelevant. Instead of presenting the Court with any authority to support her position, Martin mainly relies on a FTC report and a FDIC securitization manual, neither of which are controlling in this case and neither of which addresses whether the sale of an account receivable includes the transfer of other rights of the assignor.

A survey of other jurisdictions' interpretation of this issue reveals general agreement that a contract assignment "transfers a right from the assignor to the assignee. Thus, after a valid assignment, the assignee possesses the same rights, benefits, and remedies as the assignor once possessed." *Robert Lamb Hart Planners and Architects v. Evergreen, Ltd.*, 787 F. Supp. 753, 757 (S.D. Ohio 1992) (citing John D. Calamari & Joseph Perillo, *The Law of Contracts* §18-3 at 633, 634 (2d ed. 1977)). Most contractual rights are "freely assignable" because if they were not, "'our modern credit economy could not exist.'" *Id*. (citing E. Allan Farnsworth, *Farnsworth on Contracts* §11.2 at 61 (1990)). Other courts have relied on such basic contract law principles when concluding that assignees "may pursue the claims of the assignor and enforce the arbitration provisions of a contract." *Id*.; *see also Franklin v. Midland Funding, LLC*, 2010 WL 3931106 (N.D. Ohio Oct. 6, 2010) (finding that the sale of accounts receivable was sufficient to assign the original creditor's right to invoke arbitration as well as the right to receive payment and allowing the assignee to invoke the arbitration provision contained in the original contract).

Moreover, in the context of arbitration provisions, courts have routinely held that "arbitration is a contractual remedy, not an obligation, and therefore it can be raised" against an assignee of accounts receivables by the account debtor. *Systran Financial Servs. Corp.*, 252 F. Supp. 2d at 505 (quoting other sources). Because the account debtor can invoke arbitration as a remedy, it stands to reason that the assignee of the accounts receivable can also invoke the remedy, because "assignment cannot alter a contract's bargained-for remedial measures, for then the assignment would change the very nature of the rights assigned." *GMAC Commercial Credit LLC*, 171 F. Supp. 2d at 214; *see also*

*Pays-Bas*, 573 F.Supp. at 1469-70 (reasoning that "an assignee or other party whose rights are premised on a contract is bound by the remedial provisions bargained for between the original parties to the contract" and that an arbitration provision would not have much value if parties could escape its effect "by assigning a claim subject to arbitration between the original parties to a third party" ).

Finally, despite the fact that Cavalry is a non-signatory to the original agreement, courts have allowed similar arbitration agreements to be enforced by or against a non-signatory when the non-signatory assignee succeeded to the rights and obligations of the signatory assignor. *See, e.g., Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (finding that arbitration provision governing disputes between "you" and "us" applied to non-signatory when the non-signatory succeeded to the signatory assignor); *Laborers Int'l Union of N. America v. HAS Contractors, Inc.*, 728 F.Supp. 519, 524 n.3 (E.D. Wis. 1989) (noting that courts generally enforce arbitration agreements against contract assignees even when they are not parties to the original agreement). Thus, the fact that Cavalry was not a party to the original agreement is irrelevant to the question of whether Cavalry may enforce the arbitration provision.

Neither party has presented the Court with any authority that would contradict the findings explained above. Absent any evidence to the contrary, the Court finds that a valid agreement to arbitrate existed between the parties because the right to invoke arbitration was transferred from GE to Cavalry when Cavalry purchased the right to collect on Martin's debt. *See, e.g., Env'l Barrier Co., LLC v. Slurry Systems, Inc.*, at \*4 (finding under similar circumstances that the assignment of a right to arbitrate passed to

the assignee of accounts receivable because the assignee received all of the assignor's rights along with the sale of the right to collect payment).

## B

Having found that a valid agreement to arbitrate existed, the Court must next determine whether Martin's claims are within the scope of that agreement. In light of the broad arbitration provision in the Credit Card Agreement, and in light of the "liberal federal policy" in favor of arbitration whenever the scope of arbitration is in doubt, the instant dispute is not outside the scope of the agreement. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24.

First, "[a] fundamental rule in the construction of contracts is to determine the intention of the parties from the contract as a whole. . . ." *Meacham v. Louisville & N.R. Co.*, 169 S.W.2d 830, 832 (Ky. Ct. App. 1943). Martin does not contest her agreement to the arbitration provision, and her agreement thus demonstrates her intent to submit all disputes related to her account or to her relationship with GE, its assignees, and successors to binding arbitration. *See, e.g., Whalen*, 2009 WL 3766327, at *3.

Second, when interpreting the scope of a broad arbitration clause, and particularly where the provision expressly covers "any dispute" arising out of the interpretation of an agreement, "'only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration'" will preclude arbitration. *Masco Corp.*, 382 F.3d at 627 (quoting *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003)); *see also Shaw Group*, 322 F.3d at 121 (finding that broad arbitration provisions employing language such as "any controversy" is clear evidence of the parties' intent to arbitrate all disputes). In

16

determining whether a particular dispute falls within the scope of a broad arbitration,

"there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the

particular grievance should not be denied unless it may be said with positive assurance

that the arbitration clause is not susceptible of an interpretation that covers the asserted

dispute. Doubts should be resolved in favor of coverage.'" *AT&T Techs.*, 475 U.S. at

650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-

83 (1960)).

The arbitration provision at issue here is extremely broad and covers "any past,

present, or future legal dispute or claim of any kind" relating to the agreement, Martin's

account, or to Martin's relationship with GE or GE's successors and assigns. [R. 16-2

(Ex. C) at 8.] Martin does not present any "forceful evidence" showing that her claims

against Cavalry were purposefully excluded from this provision. Instead, without citing

any authority in support, Martin simply asserts that her claims are unrelated to her Credit

Card Agreement because they are based on the FDCPA and Kentucky usury laws. The

essence of Martin's claims relate to the rate of interest charged on her account, the

process of collection on her debt, and, as evidenced by the present dispute concerning

arbitration, to her precise relationship with Cavalry as an assignee of an account

receivable. Even when simply relying on the plain language of the arbitration provision,

it would appear that any disputes over the proper interest rate or whether a third party

may charge Martin retroactive interest after GE stopped charging her interest clearly fall

within the broad scope of the agreement. Indeed, Martin's entire cause of action

concerns Cavalry's efforts as GE's assignee to collect the debt that was the subject of the

agreement between Martin and GE, and therefore necessarily is covered by the scope of

the arbitration provision. *See, e.g., First Nat. Bank of Louisville*, 693 F.2d at 312 (upholding lower court's finding that because the recoupment claim on the debt arose from the agreement between the debtor and the assignor, the rights and obligations of the assignee were subject to all the same terms of the original agreement); *Franklin*, 2010 WL 3931106, at \*2 (finding that an action arising from the efforts of an assignee to collect on a debt necessarily fell "within the substantive scope" of a broad arbitration provision covering "any claim, dispute, or controversy" arising from that agreement).

Martin does not point to any part of the FAA or the FDCPA that would provide an exception to enforcement of the arbitration clause for her claims. Courts resolving similar disputes involving broad arbitration provisions in credit card agreements routinely find that claims concerning alleged violations of the FDCPA and state usury laws are subject to the arbitration provision in the credit card agreement. *See, e.g.*, *Hodson v. Javitch, Block & Rathbone, LLP*, 531 F.Supp.2d 827, 831 (N.D. Ohio 2008) (granting third-party debt collector's motion to compel arbitration after finding that debtor's FDCPA claims fell within the scope of a broad arbitration clause in credit card agreement because "Congress did not intend FDCPA claims to be non-arbitrable," and because courts "routinely permit arbitration of such claims"); *Green v. G. Reynolds Sims & Assoc., P.C.,* 2013 WL 1212775 (E.D. Mich. Mar. 25, 2013) (enforcing arbitration provision as applicable to an FDCPA claim brought against a third-party debt collector despite the fact that the debt collector was not an original party to the agreement and had merely purchased plaintiff's charged-off credit card account from the original creditor).

Moreover, the fact that Martin's claims are premised on the FDCPA also does not prevent arbitration of her claims. *See Green-Tree*, 531 U.S. at 89 (referencing prior

Supreme Court cases recognizing "that federal statutory claims can be appropriately resolved through arbitration" and enforcing agreements to arbitrate such claims). Even "claims arising under a statute designed to further important social policies" such as fair debt collection practices or the prevention of usury may be arbitrated because the statutes still further their intended functions as long as the litigant can advance such claims in the "arbitral forum." *Id*. at 90 (quoting *Gilmer*, 500 U.S. at 28). Indeed, Martin is reminded that compelling arbitration of her dispute is not equivalent to dismissing her case or preventing her from advancing her claims. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, (1985).

As stated above, Martin has the burden of establishing that the dispute is nonarbitrable by showing "that the [arbitration] agreement does not cover the dispute." *Green Tree*, 531 U.S. at 91-92. This is a high burden requiring Martin to overcome strong federal policy in favor of arbitration by showing that "the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs*., 475 U.S. at 650. Martin clearly has not met this burden of proof. Martin does not address the actual language of the arbitration provision, nor does she explain what she believes the provision actually covers, nor does she cite to any authority that would lead the Court to doubt whether her claims fall within the scope of the provision. Because of the "general presumption of arbitration," any doubts concerning the scope of a valid arbitration agreement must be resolved in favor of arbitration. *Masco Corp*, 382 F.3d at 627; *Moses H. Cone Mem'l Hosp*., 4670 U.S. at 24-25.

**IV**

In conclusion, the Court finds the Bill of Sale attached to Cavalry's motion was sufficient to transfer GE's contractual right to invoke arbitration as well as to collect on Martin's debt; and that because the instant action arises from Cavalry's attempts to collect the debt which was the subject of the original Credit Card Agreement, the dispute necessarily falls within the scope of the arbitration provision contained therein. *See Franklin*, 2010 WL 3931106, at *2. When a court compels arbitration under the FAA, § 3 of the FAA requires the court to stay all other proceedings, and thus the Court will also order a stay of proceedings in this matter pending arbitration. *See Fazio*, 340 F.3d at 392 (citing 9 U.S.C. § 3). Accordingly, and the Court being duly and sufficiently advised, it is hereby **ORDERED** as follows:

1.      Defendant Cavalry's Motion to Compel Arbitration [**R. 16**] is **GRANTED**;

2.      Plaintiff Martin is ordered to arbitrate her claims against Cavalry pursuant to the terms of her Lowe's Credit Card Agreement; and

3.      Pursuant to 9 U.S.C. § 3, further proceedings in this matter are **STAYED** pending arbitration.

4.      If Martin fails to initiate arbitration proceedings within sixty (60) days from the entry of this order, the case will be dismissed with prejudice.

This 31st day of March, 2014.



Signed By:

*Gregory F. Van Tatenhove*

United States District Judge